NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| ANTON MERANDO as general Administrator and Administratix Ad Prosequendum of the Estates of Kathleen Merando and Kaylyn Merando, | : : : : | Civ. No. 04-3288 (GEB) |
| Plaintiff, | : : | **MEMORANDUM OPINION** |
| v. | : : |  |
| UNITED STATES OF AMERICA, et al., | : : |  |
| Defendants. | : : |  |

**BROWN, Chief Judge**

    This matter comes before the Court upon defendant the United States' ("Government") motion to dismiss. The action was reassigned to the undersigned on September 25, 2006, and the Court, having read and fully considered all of the parties' submissions, has decided this matter without oral argument pursuant to Federal Rules of Civil Procedure Rule 78. For the reasons set forth below, the Court will grant the Government's motion to dismiss.

**I.    BACKGROUND**

    On August 11, 2003, Kathleen Merando was sightseeing in or near the Delaware Water Gap National Recreation Area ("Park") with her daughter, Kaylyn Merando, and a friend, Janine Noyes. (Perron Decl. Ex. 6 ¶ 1.) While traveling in Ms. Noyes's car on Route 615, along the New Jersey side of the Park, a large dead oak tree fell from an embankment of the Park and

1

crushed the vehicle. (Am. Compl. ¶¶ 1-2, 8-9.) Mrs. Merando and her daughter were killed instantly. (Perron Decl. Ex. 6 ¶¶ 5-6.) The tree was approximately 27 feet in length, and had been "topped," with no bark or branches. (Grodeck Cert. Exs. A, B.)

The Park consists of approximately 63,000 acres in Pennsylvania and New Jersey, and lies along forty miles of the Delaware River. (Donahue Decl. ¶ 5, Attachment 2.) It is mainly forested land, and is accessed by approximately 169 miles of roadways, 68 miles of trails, and several streams. (*Id.*) As with other national parks throughout the country, the National Park Service ("NPS"), an agency within the United States Department of the Interior, was responsible for maintaining the Park, including the area where the accident in question occurred. (Donahue Decl. ¶ 3; Degnan Dep. Tr. 74-76.)

Plaintiff, as administrator of the estates of Ms. Merando and her daughter, filed the complaint in this action on January 9, 2004. On January 23, 2006, the Government filed the present motion to dismiss. This case was reassigned to the undersigned on September 25, 2006. Briefing of the Government's motion is complete, and the Court will now address the motion.

## II. DISCUSSION

### A. Standard of Review

The Government's motion to dismiss consists of two parts. First, the Government argues that Plaintiff's claim should be dismissed for lack of subject matter jurisdiction pursuant to Federal Rules of Civil Procedure Rule 12(b)(1). Second, it argues that Plaintiff's claim should be dismissed for failure to state a claim pursuant to Rule 12(b)(6).

For motions to dismiss, "[o]rdinarily, if 'matters outside the pleadings are presented to

2

. . . the court, the motion shall be treated as one for summary judgment.'" *Robinson v. Dalton*, 107 F.3d 1018, 1021 (3d Cir. 1997) (quoting Fed. R. Civ. P. 12(c)).  If the motion is made pursuant to Rule 12(b)(1) for lack of jurisdiction, however, "a trial court 'is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case.'" *Id.* (quoting *Int'l Ass'n of Machinists & Aerospace Workers v. Nw. Airlines, Inc.*, 673 F.2d 700, 711 (3d Cir. 1982)).  "[U]nder a Rule 12(b)(1) motion to dismiss 'no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims.'" *Id.* (quoting *Mortensen v. First Fed. Sav. and Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977)).  Instead, when deciding a motion to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1), a court is "not confined to allegations in the plaintiff's complaint" and may "consider affidavits, depositions, and testimony to resolve factual issues bearing on jurisdiction." *Gotha v. U.S.*, 115 F.3d 176, 179 (3d Cir. 1997) (deciding a Rule 12(b)(1) motion to dismiss based on an argument that the discretionary function exception of the Federal Tort Claims Act barred the plaintiff's claim).  The plaintiff has the burden of proving that jurisdiction does in fact exist.  *Mortensen*, 549 F.2d at 891.

In contrast, a court considering a Rule 12(b)(6) motion to dismiss "must accept all well pleaded allegations in the complaint as true and view them in the light most favorable to plaintiff." *Angelastro v. Prudential-Bache Sec., Inc.*, 764 F.2d 939, 944 (3d Cir.), *cert. denied*, 474 U.S. 935 (1985).  The court may dismiss a complaint pursuant to Rule 12(b)(6) only if the plaintiff can prove no set of facts that would entitle him to relief.  *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).  *See also Ford v. Schering-Plough Corp.*, 145 F.3d 601, 604 (3d Cir. 1998), *cert.*

*denied*, 525 U.S. 1093 (1999).

      B.      **Whether the Government Is Immune From Plaintiff's Lawsuit**

The Government primarily argues that, while the Federal Tort Claims Act ("FTCA") constitutes a limited waiver of sovereign immunity, the discretionary function exception to the waiver applies in this case, and the Court lacks subject matter jurisdiction over Plaintiff's claim against it. Plaintiff argues that the discretionary function exception does not apply, and that the FTCA's waiver of liability subjects the Government to liability for its alleged conduct. The parties concern themselves mainly with the discretionary function exception to the FTCA, and the Court will therefore begin its discussion there.

      1.      **The FTCA and the Discretionary Function Exception**

"The Federal Tort Claims Act waives the sovereign immunity of the United States in claims 'for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment.'" *U.S. Fidelity & Guar. Co. v. U.S.*, 837 F.2d 116, 119 (3d Cir. 1988) (quoting 28 U.S.C. § 1346(b)).

"The statute, however, contains an exception for '[a]ny claim . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.'" *Id.* at 119-20 (quoting 28 U.S.C. § 2680(a)). The discretionary function exception "marks the boundary between Congress' willingness to impose tort liability upon the United

States and its desire to protect certain governmental activities from exposure to suit by private individuals." *U.S. v. Varig Airlines*, 467 U.S. 797, 808 (1984). "If governmental conduct falls within the discretionary function exception, it is irrelevant whether the United States abused its discretion or acted negligently." *U.S. Fidelity & Guar. Co.*, 837 F.2d at 120.

In *U.S. v. Gaubert*, 499 U.S. 315 (1991), the Supreme Court provided a two-part test for applying the discretionary function exception. First, a court must determine whether the act involves an "'element of judgment or choice.'" *Gaubert*, 499 U.S. at 322 (quoting *Berkovitz v. U.S.*, 486 U.S. 531, 536 (1988)). "The requirement of judgment or choice is not satisfied if a 'federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow' . . . ." *Id.* (quoting *Berkovitz*, 486 U.S. at 536). According to the Court:

> If the employee violates the mandatory regulation, there will be no shelter from liability because there is no room for choice and the action will be contrary to policy. On the other hand, if a regulation allows the employee discretion, the very existence of the regulation creates a strong presumption that a discretionary act authorized by the regulation involves consideration of the same policies which led to the promulgation of the regulations.

*Id.* at 324. In making this assessment, "it is the nature of the conduct, rather than the status of the actor," that governs whether the exception applies. *Varig Airlines*, 467 U.S. at 813.

Second, even if the challenged conduct involves an element of judgment, the court must determine "'whether that judgment is of the kind that the discretionary function exception was designed to shield.'" *Gaubert*, 499 U.S. at 322-23 (quoting *Berkovitz*, 486 U.S. at 536). "Because the purpose of the exception is to prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort, when properly construed, the exception protects only governmental actions

5

and decisions based on considerations of public policy." *Id.* at 323 (internal quotations omitted). "The focus of the inquiry is not on the agent's subjective intent in exercising the discretion conferred by statute or regulation, but on the nature of the actions taken and on whether they are susceptible to policy analysis." *Id.* at 325.

### 2. Whether the Government's Failure to Remove the Tree in Question Involved an Element of Judgment or Choice

Pursuant to the National Park Service's Organic Act, the NPS is authorized "to conserve the scenery and the natural and historic objects and the wild life [in the national parks] and to provide for the enjoyment of the same in such manner and by such means as will leave them unimpaired for the enjoyment of future generations." 16 U.S.C. § 1. With respect to the Park in particular, "the Secretary of the Interior may utilize such statutory authorities relating to areas of the national park system and such statutory authorities otherwise available to him for the conservation, management, or disposal of vegetative, mineral, or fish or wildlife resources as he deems appropriate . . . ." 16 U.S.C. § 460o-3.

> In the administration of the area for the purposes of this subchapter, the Secretary of the Interior, subject to the provisions of section 460o-3 of this title, shall adopt and implement, and may from time to time revise, a land and water use management plan, which shall include specific provision for, in order of priority –
>
> > (1) public outdoor recreation benefits;
> >
> > (2) preservation of scenic, scientific, and historic features contributing to public enjoyment;
> >
> > (3) such utilization of natural resources as in the judgment of the Secretary of the Interior is consistent with, and does not significantly impair, public recreation and protection of scenic, scientific, and historic features contributing to public enjoyment.

16 U.S.C. § 460o-4.  During the relevant times, the NPS's management plan categorized the different areas of the park into four categories – natural, developed, historic, and special use. (Donahue Decl. ¶ 9, Attachment 3.)  The area where the decedents' accident occurred was categorized as natural.  (*Id.*)

The NPS sets forth its policy concerning visitor safety in a manual entitled Management Policies 2001 ("Manual").  (Donahue Decl. Attachment 6.)  The Manual states:

> The saving of human life will take precedence over all other management actions as the Park Service strives to protect human life and provide for injury-free visits. The Service will do this within the constraints of the 1916 Organic Act.  The primary – and very substantial – constraint imposed by the Organic Act is that discretionary management activities may be undertaken only to the extent that they will not impair park resources and values.

(*Id.* § 8.2.5.1.)  The Manual further provides:

> When practicable, and consistent with congressionally designated purposes and mandates, the Service will reduce or remove known hazards and apply other appropriate measures, including closures, guarding, signing, or other forms of education.  In doing so, the Service's preferred actions will be those that have the least impact on park resources and values.

(*Id.*)  Plaintiff fails to identify any "federal statute, regulation, or policy," or any language in the Manual, that "specifically prescribes a course of action" with respect to inspecting and removing hazardous trees.  *Gaubert*, 499 U.S. at 322 (internal quotations omitted).

Although the NPS did not have a written policy for removing hazardous trees, it followed an unwritten policy of removing trees that it considered to be hazardous.  (Donahue Decl. ¶ 24.) In areas of high visitor usage, the roads and trails crew, which consisted of two supervisors and eleven employees ("Roads and Trails Crew" or "Crew"), would travel on foot to inspect trees to see if they were hazardous.  (Donahue Decl. ¶ 28.)  In undeveloped, low usage areas, the Crew

performed what are known as "windshield" inspections, whereby they would drive and inspect trees by surveying them from the car. (*Id.*) If, through such windshield inspections, a tree was found to be potentially hazardous, members of the Crew would walk to the tree and inspect it more carefully. (*Id.*) The NPS did not specify any route or schedule for conducting such windshield inspections. (*Id.*) The area of the Park where the accident occurred was a low visitor usage area that was subject to windshield inspections. (*See* Donahue Decl. ¶ 9.)

In arguing that the Government lacked discretion in deciding whether to report the tree that caused the accident, Plaintiff does not claim that the NPS lacked discretion in choosing to use windshield inspections in the area of the accident. (*See* Pl.'s Br. 2.) Plaintiff argues instead that the NPS had a policy of reporting "topped" trees, and that the Roads and Trails Crew had no discretion in implementing that policy. (*See id.* 16.) According to Plaintiff, "it is the policy of the National Park Service not to top trees and to remove topped trees because, if not already dead, a topped tree will inevitably die and present a hazard," and that "it was the responsibility of the [road] crew to report the existence of this highly hazardous tree," which did not occur. (*Id.*)

In *U.S. v. Varig Airlines*, 467 U.S. 797 (1984), the Supreme Court addressed a similar argument. In that case, the plaintiffs brought suit against the United States for the Federal Aviation Administration's ("FAA") alleged negligence in certifying the safety of two airplanes that caught fire during their respective flights. *Varig Airlines*, 467 U.S. at 799-800, 802-03. The United States, in turn, argued that the FAA monitored compliance with safety standards through a "spot-check" program, and that the program was protected by the discretionary function exception. *Id.* at 815. The Court observed that "[t]he operation of this 'spot-check' system is outlined in detail in the handbooks and manuals developed by the [] FAA for the use of their

employees." *Id.* at 817.

In interpreting "[the plaintiffs'] contention that the FAA was negligent in failing to inspect certain elements of aircraft design before certificating the [planes in question]," the Supreme Court stated that the argument "necessarily challenges two aspects of the certification procedure: the FAA's decision to implement the 'spot-check' system of compliance review, and the application of that 'spot-check' system to the particular aircraft involved in these cases." *Id.* at 819. The Court found that both types of decisions were protected by the discretionary function exception. With respect to the FAA's decision to use the "spot-check" system, the Supreme Court stated that:

> the FAA has determined that a program of 'spot-checking' manufacturers' compliance with minimum safety standards best accommodates the goal of air transportation safety and the reality of finite agency resources. Judicial intervention in such decisionmaking through private tort suits would require the courts to 'second-guess' the political, social, and economic judgments of an agency exercising its regulatory function. It was precisely this sort of judicial intervention in policymaking that the discretionary function exception was designed to prevent.

*Id.* at 820. The Court further held that the exception also protected the FAA's allegedly negligent implementation of the "spot-check" program. The Court found that "[t]he FAA employees who conducted compliance reviews of the aircraft involved in this case were specifically empowered to make policy judgments regarding the degree of confidence that might reasonably be placed in a given manufacturer, the need to maximize compliance with FAA regulations, and the efficient allocation of agency resources." *Id.* According to the Court, "these FAA engineers and inspectors necessarily took certain calculated risks, but those risks were encountered for the advancement of a governmental purpose and pursuant to the specific grant of authority in the

9

regulations and operating manuals" such that their decisions were protected by the discretionary function exception. *Id.*

In *Mitchell v. U.S.*, 225 F.3d 361 (3d Cir. 2000), the Third Circuit Court of Appeals addressed a similar issue in a negligence action against the United States for a car accident resulting from its alleged negligence in maintaining a national park. There, the plaintiff sued the United States for the NPS's failure to repair a drainage ditch and concrete head-wall, located beside a roadway running through a certain recreational area, that resulted in a car accident that injured the plaintiff. *Mitchell*, 225 F.3d at 362. An engineering study of the roads in the area, conducted several years before the accident, determined that "most of the paved roads . . . are in need of an overlay," that "[c]oncrete posts, telephone poles, culvert head-walls, and trees within the clear zone . . . may constitute a safety hazard," and that such encroachments existed "on nearly all road sections in the Park." *Id.* at 363. The Court of Appeals nonetheless found that the discretionary function exception applied, stating that "[t]he [NPS]'s choice to focus on a few highly dangerous portions of the road rather than to distribute its finite resources along the whole of [the roadway] is a policy choice this court should not second-guess." *Id.* at 364.

In *Autery v. U.S.*, 992 F.2d 1523 (11th Cir. 1993), the Eleventh Circuit Court of Appeals addressed the same issue in another action based on the United States' alleged negligence in maintaining a national park. The court noted that "the unwritten policy at [the park] at the time of the accident was to make every reasonable effort within the constraints of budget, manpower, and equipment available to detect, document, remove, and prevent tree hazards." *Autery*, 992 F.2d at 1525. In describing the tree removal program, the court observed that:

[i]n order to effectuate this policy, [the park] personnel initially conducted visual

>inspections from trucks driven along the road. Any tree that appeared hazardous was then inspected more closely. '[I]t was the established practice at the park for all employees to identify and report known or potentially known hazardous trees to supervisors or maintenance personnel for appropriate action.'

*Id.* at 1525 (citations omitted). Despite the existence of this policy, though, the court found that the discretionary function exception applied. The court stated that "[i]t is the governing administrative policy, not the [NPS]'s knowledge of danger, . . . that determines whether certain conduct is mandatory for purposes of the discretionary function exception." *Id.* at 1528.

>[T]he relevant inquiry here is whether controlling statutes, regulations, and administrative policies mandated that the [NPS] inspect for hazardous trees in a specific manner. If not, then the Park officials' decision to employ a particular inspection procedure – *and its execution of that plan* – is protected by the discretionary function exception.

*Id.* (emphasis added). The court found that "the inspection plan in effect at the time of the accident did not compel park employees to inspect certain trees on certain days or remove a particular number of trees per week." *Id.* at 1529. The court noted that although "park officials had information regarding the potential danger of [the trees at issue]," that fact "did not remove their discretion to plan and implement the tree inspection plan." *Id.* at 1529 n.11.

Here, the NPS was responsible for choosing the methods by which it maintained the Park and protected its visitors. The NPS's decisions concerning tree inspections, i.e. using windshield inspections for lower usage areas, involved the type of judgment or choice that the discretionary function exception protects. Although the Plaintiff characterizes the Government's alleged negligence as the failure to implement the unwritten policy of removing hazardous trees, the Court interprets the claim differently. *See Fisher Bros. Sales, Inc. v. U.S.*, 46 F.3d 279, 286 (3d Cir. 1995) ("the fact that we must accept the plaintiffs' version of the facts as true does not mean

that we must accept plaintiffs' *characterization* of those facts") (emphasis in original). Plaintiff challenges the NPS's failure to detect and report the hazardous tree in question, but that failure was the result of the NPS's choice – based on its policy mandates to preserve the Park while protecting visitors – to provide closer inspection of trees in high usage areas and to use windshield inspections for trees in lower usage areas. The NPS's alleged conduct, therefore, involved an element of judgment and choice to invest fewer resources to inspecting trees in the lower usage areas of the Park. *See also Wright v. U.S.*, 1996 WL 172119 at *3 (6th Cir. 1996) (holding that an NPS management plan providing for the removal of hazardous trees allowed for discretion to decide whether to cut the rotten trees in the area where the plaintiffs were injured). *But see Caraballo v. U.S.*, 830 F.2d 19, 22 (2d Cir. 1987) (holding that because the NPS decided to undertake "all inclusive – by land, by sea and by dog – patrols, the government had a non-discretionary duty to carry them out in a non-negligent manner"); *Aslakson v. U.S.*, 790 F.2d 688, 693 (8th Cir. 1986) (holding that a federal agency's failure to raise the height of electrical power lines that killed the decedent was not protected by the exception because "the challenged governmental activity involve[d] safety considerations under an established policy rather than the balancing of competing public policy considerations").

        3.      **Whether the Government's Failure to Remove the Tree Was Based on Considerations of Public Policy**

The Government's alleged failure also involved considerations of public policy. In finding that the NPS's failure to make certain repairs, the Court of Appeals in *Mitchell* found that "[t]he [NPS]'s choice to focus on a few highly dangerous portions of the road rather than to

distribute its finite resources along the whole of [the roadway] is a policy choice this court should not second-guess." *Mitchell*, 225 F.3d at 364. *See also Varig Airlines*, 467 U.S. at 820 (holding that in implementing the FAA's "spot-check" program for inspecting airplane designs, its "engineers and inspectors necessarily took certain calculated risks" and that "those risks were encountered for the advancement of a governmental purpose and pursuant to the specific grant of authority in the regulations and operating manuals"); *Gen. Public Utils. Corp. v. U.S.*, 745 F.2d 239, 244-45 (3d Cir. 1984) (holding that the discretionary function exception applied because "[t]he intensity and breadth of an investigation [by the Nuclear Regulatory Commission] is necessarily influenced by the resources available, both in terms of technically-trained personnel and funding," and that "[o]f necessity, judgments must be made as to priorities and allocations of resources"). *But see Cope v. Scott*, 45 F.3d 445, 452 (D.C. Cir. 1995) (holding that the NPS's failure to post a sign warning of a slippery roadway was not a policy judgment because the Government "failed to demonstrate how [its aesthetic considerations] affect[ed] the placement of traffic signs"); *Summers v. U.S.*, 905 F.2d 1212, 1215 (9th Cir. 1990) (holding that the NPS's failure to post a sign warning that a "fire ring" was dangerous did not constitute a policy judgment because the failure did not result from "a decision reflecting the competing considerations of the [NPS]'s sign policy").

      Here, the NPS was faced with policy choices concerning how to use its limited budget and personnel to preserve the Park and to protect the Park's visitors. In balancing its responsibilities, the NPS made a policy decision to use windshield inspections to inspect trees in lower usage areas, and conducting closer inspections of trees in higher usage areas. Similar to *Mitchell* and *Varig Airlines*, the Court finds that the NPS's alleged conduct concerned judgment

13

"of the kind that the discretionary function exception was designed to shield." *Gaubert*, 499 U.S. at 322-23 (internal quotations omitted).

### 4. Plaintiff's Arguments Are Unpersuasive

Plaintiff argues that the discretionary function exception does not apply here because the NPS had a policy of reporting "topped" trees, and that the Roads and Trails Crew failed to report the "topped" tree that caused the accident in question. (*See* Pl.'s Br. 16.) In support of his argument, Plaintiff refers to: (1) a response by the Government to one of Plaintiff's interrogatories; (2) an NPS guideline entitled NPS-77 ("Guideline"); and (3) the deposition testimony of Messrs. Degnan and Geis. None of the evidence to which Plaintiff cites supports his argument.

The interrogatory response states, in relevant part, that "[a] hazardous tree is one that, because of a recognizable mechanical flaw poses a significant threat to people or property," and that "NPS employees at the Recreation Area report the existence of trees that may pose a threat if they observe them in the course of their duties." (Grodeck Cert. Ex. E.) The response reveals nothing, however, about how the NPS should find such trees – only that hazardous trees, if found, should be reported.

The Guideline, meanwhile, provides that:

> The NPS must seek to implement [a hazardous tree program] that will reasonably protect visitors from unnecessary risks resulting from hazardous trees. . . . The inherent decision-making challenge in addressing hazardous trees is to preserve and sustain healthy trees as components of the park's natural system, while treating or removing trees with discernible defects which represents risks to the public or property.

14

(Grodeck Cert. Ex. L at 350.) The Guideline states that "any trees which stand within falling distance of public use areas and which might pose a hazard to the public or significant property should be systematically inspected for flaws." (*Id.* at 351.) It acknowledges that "[t]he form and frequency of routine inspection or surveillance will depend on the type of visitor use areas," and that "[t]he constraints of manpower available to a park may not permit periodic inspection of all pertinent areas." (*Id.*) The Guideline states that "[d]eliberate visual inspections of transportation corridors should include all trees that could affect the roadway." (*Id.* at 354.) It also notes, however, that "it may not be realistically possible to walk by all trees along miles of roadways, and under these conditions a documented drive-by inspection should be considered satisfactory." (*Id.* at 354-55.) The Guideline does not prescribe any course of action for the NPS's inspection of trees – it only indicates that the NPS, in conducting visual inspections, "should" include all trees that could affect the roadway.

Plaintiff also refers to the deposition testimony of Messrs. Degnan and Geis to show that NPS employees had no discretion over whether to remove a hazardous tree such as the one at issue. Mr. Degnan, the roads and trails supervisor at the Park, acknowledged that the tree was "obviously a dead tree," and that "[i]f it had been seen, [the Crew] would have turned it into me" because it was their responsibility to do so. (Degnan Dep. Tr. 7, 56-57, 61.) There is no evidence, however, showing that any member of the Roads and Trails Crew saw the tree at issue, or that it failed to adhere to the NPS's policy of performing windshield inspections in the lower usage areas of the Park.

Mr. Geis, a facilities manager for the Park, testified that the NPS had removed a number of "topped" trees because they were hazardous trees, and that he had observed a number of those

15

trees by conducting windshield inspections. (Geis Dep. Tr. 8, 23.) Those trees, however, were detected and removed after the date of the accident – there is no evidence showing that NPS employees detected the tree at issue and failed to report it. (*Id.* 30-33.) Plaintiff acknowledges that "the crew failed to observe the tree," but argues that "the failure to see the tree is not a discretionary act." (Pl.'s Br. 8.) In challenging the NPS's "failure to observe the tree," Plaintiff is also challenging the NPS's prioritization of high usage areas over lower usage ones in inspecting for hazardous trees. Such decisions, however, are protected by the discretionary function exception to the FTCA.

### C. The Government's Rule 12(b)(6) Argument

The Government also argues that Plaintiff's claim should be dismissed pursuant to Rule 12(b)(6) because the New Jersey Landowners Liability Act, N.J. Stat. Ann. §§ 2A:42A-2 to 42A-8.1, bars Plaintiff's lawsuit. (Gov.'s Br. 28-32.) Given that the discretionary function exception protects the Government from Plaintiff's claim, there is no need to address that argument.

### III. CONCLUSION

For these reasons, the Government's motion to dismiss is granted. An appropriate form of order is filed herewith.

Dated:   October 5, 2006

                  s/ Garrett E. Brown, Jr.
                GARRETT E. BROWN, JR., U.S.D.J.